| gGOTHARD, Judge.
This is a personal injury action brought by plaintiff, Catherine Thom, for injuries received in a head-on collision. Defendant, Alfred Soo, president of Benson Chevrolet Company, Inc. (Benson), who was driving a vehicle owned by Benson apparently fell asleep at the wheel, crossed over into the oncoming lane and collided with Ms, Thom’s vehicle on Mississippi Highway 603. The accident happened at about 3:30 a.m. on April 24, 1994, as Ms. Thom was driving to the Jubilee Casino where she was employed as a dealer.
There was an extended trial in this matter which began in October, 1996 and ended in May, 1999. During that time the trial court heard testimony on October 16-17, 1996, April 30, 1997, September 8-9, 1997, November 14, 1997, April 30, 1998, June 24, 1998, and August 24, 1998. The matter was taken into consideration and judgment was rendered on | .January 20, 1999. In that judgment, the trial court found in favor of Ms. Thom and against defendants in the amount of $395,065.40. The judgment also provided that defendants pay all costs. Defendants filed a “Motion for Written Reasons for Judgment and for New Trial”. On March 5, 1999 the trial court filed written reasons for judgment in which it stated that it made a determination that Mr. Soo’s negligence was the sole cause of the accident. The reasons also itemize the damages awarded as follows:
Loss of enjoyment of life $250,000.00
Past lost wages 42,325.00
Future lost wages 40,000.00
Loss of fringe benefits 31,247.00
Medical expenses 31,493.40
On June 21, 1998, the trial court rendered a second judgment, denying defendant’s motion for new trial and awarding $3,466.97 in costs and $5,400.00 in expert witness fees. Both parties have filed appeals raising questions which relate to damages. No issues of liability are presented for our consideration in this appeal.
At trial the court heard testimony from Dr. Louis Provenza, a neurosurgeon who treated Ms. Thom. He testified that he first saw Ms. Thom about one week after the accident. At that time she complained of some upper chest pain, right chin pain, and frontal forehead pain. She also related to the doctor that she lost consciousness briefly at the time of the accident. She also experienced some blurred vision in the right eye and some dizziness.
|4Pr. Provenza conducted a neurological examination which included checking reflexes and motor screening. Those results were normal. Ms. Thom did have about a six-by-five centimeter cephalhematoma in the frontal region. She also had some facial bruising and bilateral periorbital edema. There were bruises on her right forearm and shin. There was some right subconjunctival hemorrhage in her eye.
Dr. Provenza reviewed a Computerized Axial Tomography (CT) scan which was performed on Ms. Thom at Hancock Medical Center shortly after the accident. Although the results were negative, that finding does not completely rule out a closed-head injury. Dr. Provenza explained that the brain is gelatinous and moves freely inside of the skull. In an accident such as the one in which Ms. Thom was involved, there exists an acceleration/deceleration type of injury. The skull stops, but the brain continues to travel, effecting the frontal lobe. During the deceleration phase, the brain recoils back, causing occipital injuries. Dr. Provenza further explained that the frontal lobe of the brain controls various functions including alertness, emotion, and judgment.
On the second visit, Ms. Thom complained of posterior cervical pain, and intermittent numbness of both hands and feet. She had seen an orthopedist for her right knee and ankle. Dr. Provenza also referred her to an ophthalmologist for treatment of blurred vision. Dr. Provenza ordered an MRI, which was conducted on June 9, 1994. It showed some exaggeration of normal cervical lordosis, which *991 means cervical spasm. She did have a small disk problem due to a mild bulge on C6-7 and some posterior defects at 5-6 and 6-7. Dr. Provenza could not say for certain if |fithe cervical injuries were caused by the accident or were part of a degenerative process which pre-dated the accident. An Electroencephalogram (EEG) conducted showed normal results.
Other symptoms experienced by Ms. Thom included weakness in her grip, fatigue, sleeplessness, irritability, and subtle personality changes. Dr. Provenza stated that all of those symptoms were consistent with a closed-head injury.
Dr. Provenza’s diagnosis was that Ms. Thom had a concussion which he felt was resolved by August 23, 1994. He stated that there was no visual structurally evident injury to the brain. Thus, he could not confirm that she had any permanent injury to the brain. He did not refer Ms. Thom to a neuropsychologist or tó a psychiatrist for evaluation and treatment because he did not feel such referrals were necessary.
Plaintiff also presented testimony from Dr. Susan Andrews, a clinical neuropsy-chologist, who evaluated Ms. Thom shortly after the accident. Dr. Andrews testified that she took a complete medical history and performed a series of tests in her evaluation. She tested Ms. Thom in July, 1994 and then again in July, 1996. At the time of the first test, Ms. Thom was beginning to show signs of suffering from anxiety disorder and was having difficulty driving and sleeping. She also complained of problems with memory, attention and concentration. Dr. Andrews testified that Ms. Thom also had difficulties with word finding and speech sounds discrimination. She had obvious right-handed motor weakness. In her evaluation, Dr. Andrews concluded that Ms. Thom suffered a closed-head injury and needed rehabilitation and therapy. Other physical injuries which were evident to | fiDr. Andrews were pain in the shoulder, swelling and pressure at the site of the head injury, and knee and leg pain.
Dr. Andrews testified that she also reviewed Ms. Thom’s academic records and found that she had a particular ability in mathematics. She was very quick with figures in her head, an asset she used as a dealer at the Jubliee Casino. However, after the accident, the testing revealed that Ms. Thom had several areas of deficit activity in the frontal area of the brain. Specifically, she had difficulty with problem solving ability such as, conceptual reasoning, ability to shift from one area of thinking to another, or to change her behavior. The testing also showed some impairment of memory function and right motor strip function. Dr. Andrews stated that the results of her tests are consistent with a trauma and resulting hematoma of the frontal portion of the brain.
In the second test done two years after the accident, Dr. Andrews found that Ms. Thom had made significant improvement. Dr. Andrews explained that, given time, the brain will repair itself to whatever extent possible even without rehabilitation. Dr. Andrews opined that the results of both tests convinced her that Ms. Thom suffered brain damage in the accident.
Dr. Andrews further testified that, although she did show improvement on the second test, Ms. Thom still has some difficulty with mental arithmetic. She scored in the average to high average range in the second test. However, it cannot be determined how high she would have scored before the accident.
|7Pr. Andrews explained that the healing process in an injury like the one sustained by Ms. Thom takes about two years. Dr. Andrews stated that in the first test Ms. Thom showed a poor average memory and delayed recall. However, in the second test she showed an almost superior range ability to remember what she has learned. One area in which she showed little improvement is attention and concentration. Her reaction time in processing informa *992 tion is extremely slow considering her age and Intelligence Quotient (I.Q.).
Dr. Andrews testified that her conclusions are that, after two years of healing, there has been a personality change, and Ms. Thom is still showing some mild residual deficits. She has lost her ability to attend to multi-tasks. That activity, which allows one to do two things at one time, requires a higher level of attention. She also shows some deficit in right hand motor skill and coordination. Dr. Andrews opined that the residual effects of the accident will prevent Ms. Thom from returning to her employment as a casino dealer.
Dr. Oscar Griffith, an accident reconstruction expert, testified that he reviewed the depositions of both drivers and the police officer who investigated the accident, as well as the police report and photographs. Dr. Griffith also considered the specifications of the particular vehicles involved in the accident.
In his explanation of the accident, Dr. Griffith testified that Mr. Soo’s vehicle encroached on Ms. Thom’s lane of travel. She recognized the urgent emergency and took evasive action by pulling onto the shoulder of the road. Dr. Griffith testified that the vehicles met at the left front corner to left front |scorner. Ms. Thom’s vehicle was pushed backwards about 100 feet at an estimated rate of about 20 miles per hour after the impact. Mr. Soo’s vehicle was rotated 180 degrees.
Dr. Griffith estimated that Mr. Soo’s vehicle was traveling at about 54 mph at the time of impact, while Ms. Thom was traveling at about 20 mph. Dr. Griffith explained that the impact subjected Ms. Thom to 47 “G’s” which means that the constraint force necessary to have Ms. Thom decelerate with the vehicle would be about 5800 pounds. He also surmised from the condition of the steering wheel and the rupture of the windshield that the restraint system in the car was inadequate to prevent Ms. Thom’s head from hitting those objects.
The court also heard evidence from Brenda Crawford, an expert in speech pathology. Ms. Crawford testified that she conducted an evaluation of Ms. Thom in March of 1995. In that evaluation Ms. Crawford found that Ms. Thom had some problems in several different areas. She had problems with short term memory, organization and word fluency, auditory processing, speed and accuracy, abstract reasoning, and a very mild problem with articulation which caused a slurring of her speech when she was very tired. Ms. Crawford recommended therapy two to three times a week for a period of four months.
After completion of the therapy, Ms. Thom showed considerable improvement. She had grown to a level of abstract reasoning which allowed her to not only interpret, but also use some metaphors and common expressions. She was relying more oh her own memory and was more adapt in word fluency and conversational speech. However, Ms. Crawford stated 19that she felt that the therapy would no longer generate continued improvement. While she has made significant progress, she still has some memory and word fluency deficits that will always be there. Ms. Crawford testified that these deficits would interfere with Ms. Thom’s daily life, in that they would hinder her memory and speech, and lessen her self-esteem.
Dr. Richard Cicinelli, a psychiatrist who treated Ms. Thom, testified that he began the treatment about five months after the accident on a referral from Dr. Susan Andrews. The patient was evaluated for PosG-Traumatic Stress Disorder and Organic Brain Syndrome, which is a mild dementia. The classic symptoms of those conditions are, poor temper control, lack of focus, poor impulse control, poor concentration, recent memory problems, and secondary symptoms such as depression, paranoia and a feeling of alienation. Ms. Thom complained of poor memory, lack of concentration, a significant decrease in *993 math skills, frustration and a lack of patience.
She also had problems with fine motor coordination and balance, which are common in Organic Brain Syndrome. Dr. Ci-cinelli referred Ms. Thom to a physical therapy clinic for treatment of those symptoms. The report received from the therapy clinic indicated Ms. Thom has poor' dexterity, especially in the right hand. She was in the 28 th percentile for right-hand activity, and the 58 th percentile in the left hand. She also had some difficulties with balance.
Dr. Cicinelli also diagnosed Ms. Thom with Post-Traumatic Stress • Disorder. Symptoms of that disorder which were evident in Ms. Thom’s case are night terrors, or dreams of an actual re-enactment of the incident, |indaydreams of intrusive thoughts and visual memories of the accident, insomnia, and an increased fear of death.
Dr. Cicinelli treated Ms. Thom for over two years and described her as a motivated individual who was reluctant to take medication. He described changes in her personality which were caused by the accident. Dr. Cicinelli described Ms. Thom as a person who liked to get problems fixed and over. Now, however, she is forced to live with unresolved problems. That has changed her personality. She has psychological symptoms of vulnerability, lack of confidence, and decreased self-esteem. She must live with her sister now, and it is a strain, rather than a pleasure.
Dr. Cicinelli testified that at the time of trial, Ms. Thom had made some improvement. The Brain Syndrome had leveled off, although he did not feel that she will ever return to her former level of functioning. Her superior math ability will not return sufficiently to allow her to return to her employment as a casino dealer. He opined that the Post-Traumatic Syndrome is resolved in the sense that it is no longer the agonizing disorder that affects her on a daily basis, even though she will have certain residual symptoms. Dr. Cicinelli testified that Ms. Thom should continue in therapy monthly for the rest of her life.
Dr. Sanjeeva Reddy, a gastroenterologist who treated Ms. Thom in the emergency room at Hancock Medical Center, testified that she was brought in by ambulance after the automobile accident. According to the hospital records, Ms. Thom was “alert and awake times three”, an indication that her mental function was within normal range by the time she reached the hospital. Dr. Reddy explained that a normal patient is alert and awake Intimes three which indicates that the patient is oriented in place, person and time.
The patient complained of pain in the chest and right knee. She had an ecchy-mosis in the right front head, and a hema-toma was noted. There was a questionable loss of consciousness.
Dr. Reddy recalls that Ms. Thom was a restrained driver who was not ejected from the car. She complained of a headache, right shoulder, and right leg pain. She denied any loss of consciousness. His examination revealed that Ms. Thom was under moderate stress. She had a swelling of the forehead and a contusion around the eye. There was no evidence of trauma or blood behind the tympanic membranes. She had a contusion of the right shoulder, but a full range of motion.
Dr. Reddy ordered x-rays of the spine, the skull, the chest, and the leg. These x-rays were all negative for broken bones. Ms. Thom did have a frontal hematoma. Dr. Reddy’s diagnosis was multiple contusions as a result of a motor vehicle accident.
Dr. Reddy reviewed the report of the-medic in the ambulance. That report, showed the patient was confused. The report further showed that Ms. Thom was “alert and awake times two”, indicating that she was more disoriented at the scene of the accident, and had made some progress by the time she reached the hospital.
*994 The court also heard testimony from Dr. Warren Bourgeois, an orthopedic surgeon who treated Ms. Thom. Dr. Bourgeois stated that he first saw Ms. Thom on May 25, 1994. At that time she had persistent swelling in her face, particularly her forehead and around her eyes. She had |1Pa large, firm mass under the skin on her forehead measuring about three by five centimeters. She also had persistent bruising about the face. She complained of pain in her chest wall, and in the right lower extremity from the knee to the ankle. She had additional bruising and pain in other parts of her body. She also had problems with anxiety and loss of concentration. Dr. Bourgeois attributed all injuries to the automobile accident which is the subject of this lawsuit.
On subsequent visits Ms. Thom complained of an increase in right shoulder pain. Dr. Bourgeois’ examination showed that Ms. Thom’s complaints were consistent with rotator cuff tendinitis and some mild acromioclavicular joint injury.
X-rays and an MRI revealed that Ms. Thom had a fractured sternum and a torn rotator cuff. She required surgery to repair the rotator cuff tear. Afterward Dr. Bourgeois recommended physical therapy to rehabilitate the shoulder. By the end of November, 1995, Ms. Thom had completed the therapy and exhibited a significant decrease in pain and an increase in mobility of the shoulder.
On January 2, 1996, Ms. Thom made her last visit to Dr. Bourgeois. At that time she had pain, numbness, and tingling in both hands while driving, sleeping or prolonged siting. A physical examination confirmed that she had an ulnar nerve irritability, or sensitivity in both elbows. She still had some nagging back pain and persistent sternal pain in the region of the fracture. Dr. Bourgeois opined that it is likely that Ms. Thom will develop post-traumatic arthritis of her acromioclavicular joint as a result of the trauma.
|1sDr. Thomas Krefft, a neurologist who treated Ms. Thom also testified at trial. He stated that Ms. Thom related the same complaints to him which have been discussed in previous testimony. His diagnosis was that Ms. Thom had a status post closed-head injury with post head trauma syndrome. She also had hypertension, a fractured sternum, and classic migraine headaches which pre-dated the accident. Dr. Krefft’s testimony paralleled that of previous professional testimony regarding the effects this type of injury would have on math ability, memory, speech and personality. Dr. Krefft did state that he found absolutely no sign of an organic brain injury. Ms. Thom had a bruise on her forehead; however, she did not have any of the neurologic findings which would be expected in a patient with an organic brain injury.
The plaintiff also presented evidence from Thomas Stewart, a vocational rehabilitation counselor, who evaluated Ms. Thom. Mr. Stewart testified that he met with Ms. Thom on three occasions and reviewed her medical records. When Mr. Stewart saw Ms. Thom, she was employed at Robert’s Restaurant as a part-time prep cook. Mr. Stewart opined that she had reached her maximum level of employment. She was originally making food deliveries, but had to be taken off that duty because it was too overwhelming. She was unable to remember the directions and prices on the deliveries. She also reported that, although she prepared many of the same desserts using a few simple ingredients, she had to consult her recipe each time.
Mr. Stewart testified that Ms. Thom was willing to do as much as she can possibly do and was frustrated that she can’t do more. She must make [14written lists in order to follow simple verbal instructions. She can do slow, repetitive tasks. She also tires very easily and is unable to work more than four to five hours a day.
Ms. Thom was a high school graduate, but has no college. She did well in math and poorly in spelling. Before the acci *995 dent Ms. Thom was trained • as a card dealer. In order to continue that employment, she would need quick. short-term memory skills. It is a very fast-paced job. She would have to recall numbers, keep count of cards of up to seven players at a table. Mr. Stewart did not believe Ms. Thom could function as a card dealer now. He opined that if she continued in the supportive environment at Robert’s Restaurant, she could continue her employment. However, she could not perform any job which put her under any stress or required more than five hours a day.
Mr. Stewart testified that part of his report includes the availability, compensation and fringe benefits of employment as a casino dealer. That portion of the report shows that such jobs are available at between nine and eleven dollars per hour. The casinos also offer vacation and health benefits as part of the compensation.
Plaintiff also presented the deposition of Bobby Roberts, who conducted a vocational evaluation of Ms. Thom. He testified that prior to the accident Ms. Thom had a wide range of clerical skills which were used throughout her work history. Her employment relied on her math aptitude. She did actuary work for insurance companies and accounts receivable work. This type of employment was consistent until she trained as a casino dealer. Mr. Roberts fully explained the tasks expected of a casino dealer |iaand found them consistent with Ms. Thom’s ability and skill before the accident.
Based on Mr. Roberts’ evaluation of Ms. Thom after the accident, she did not have the math skills required to continue her employment as a casino dealer. She also showed deficiencies in size and shape discrimination. Her eye-hand coordination was low, as was her primary finger dexterity. Coordination of upper and lower extremities simultaneously is a problem for her.
Mr. Roberts stated that Ms. Thom is still having a word defining problem which causes her frustration. His opinion is that she would need further evaluation from a speech therapist to determine whether additional speech therapy would assist in word defining skills. She may also need a work adjustment program to help her cope with the frustration of not being able to remember some tasks.
Dr. Melvin Wolfson, an economist who conducted an economic evaluation of Ms. Thom, testified that, in doing the evaluation, he relied on loss of earnings and loss of earning capacity. He considered what she could have earned at the time of the accident on April 24, 1994, and extrapolated what she could have earned though September 8, 1997 (the date of the testimony). Then he subtracted what she did actually earn during that period, and calculated before and after tax how much money would be necessary to award to her to reimburse her for her losses. That figure is $55,983.00 before taxes and $42,325.00 after taxes. Giving the defendant credit for the fact that she is now working, her loss from trial forward before tax would be $89,830.00 after tax would be $86,519.00. Further, she |1fiis now forced to secure her own health insurance at the rate of $284.00 per month to age 65. The present value of that loss of benefit is $31,247.00.
Dr. Wolfson also testified that the methodology for calculating the loss of capacity to enjoy life is a two-step process which relies on Ms. Thom’s earning capacity as a unit of measurement, and the principal that the value of leisure time is worth more than the working time. An arbitrary multiple is used to represent the second principle. It can be different for working years as opposed to retirement years. Dr. Wolfson acknowledged that the decision on the multiple to use in the equation is in the hands of the trier of fact. He suggested various factors to be considered in determining the multiple to use in the equation such as the plaintiffs ability to participate in various life activities such as sleep, exercise, and hobbies. Then the earning capacity is multiplied by that arbitrary mul *996 tiple. Then a decision is made on the number of years to use the multiplier, and the formula is complete.
Dr. Wolfson explained that his example is based on sound economic principles in that it uses an objective standard of earning capacity, and the concept that there is a trade off between working time and leisure time. The application of a multiple is also sound from the standpoint that it uses the combination of those two principles.
As to the figure used for lost wages, Dr. Wolfson used the records of Ms. Thom’s actual earnings before the accident, and discounted that rate for her current earnings. Dr. Wolfson also testified that the present value on future medicals is $36,-179.00. That figure is based on an estimated cost of $150.00 per month to age eighty.
117The record also contains the deposition of Sherri Mitts, the controller for the Jubilee Casino. She verified Ms. Thom’s employment as a dealer with the casino, and verified all records from the casino which are now part of this record.
Ms. Thom’s sister, Jane Geauthreaux, testified that Ms. Thom moved in with her in 1992 after a divorce. Ms. Geauthreaux explained that Ms. Thom worked at an insurance company in New Orleans until she married Larry Thom in 1983. At that time it was agreed that she would stay at home and care for her three young stepchildren. In 1992 the couple separated and Ms. Thom went to live with her sister in Diamond Head. Ms. Thom was employed at the local Wal-Mart while attending a school to become a dealer. Ms. Geauthreaux testified that her sister enjoyed her job as a casino dealer very much. Since the accident, however, she has been working in a restaurant part-time.
Ms. Geauthreaux testified that her sister is still frightened to drive on the highway on which the accident happened. She is afraid to drive in the rain or at night, and has a tendency to drive on the shoulder when a car is coming toward her on a two lane road.
Ms. Geauthreaux testified that before the accident, her sister enjoyed playing games such as jump rope with her grandchildren, activities in which she has been unable to engage since the accident. Further, Ms. Thom has complained of shoulder and back pain, and memory problems as a result of the accident. Ms. Geau-threaux also noticed that since the accident Ms. Thom has trouble expressing herself and has much less patience. She gets frustrated that she is unable to function as she did before the accident. Ms. 11sGeauthreaux testified that her sister enjoyed her job as a casino dealer and considered it a “highlight” in her life. She also engaged in gardening and cooking among other chores around the house. However, since the accident her energy level is such that she is unable to do those things now.
Ms. Geauthreaux has found it necessary to offer her sister financial help since the accident. Before the accident, Ms. Thom was paying $75.00 per week rent and supporting herself. Now she pays $25.00 per week and relies on her sister to provide her with clothes.
Ms. Thom testified at the trial. She recounted the events of the accident in which she was injured. She recalls regaining consciousness and feeling a lot of blood on her face. She was pinned in her car in the darkness, and was screaming for help. She remembers being helped out of the car and lying on the ground. She recognized a co-worker and asked her to call Ms. Geauthreaux. At that point, the pari-medics came and placed her in a neck brace and on a board. She was transported to the hospital. At the hospital Ms. Thom remembers being frightened and in pain. She was unable to see clearly because both eyes were swollen. The pain in her chest was so severe she was unable to breath lying down.
*997 Ms. Thom explained that at the time of the accident, she was working at the Bayou Caddy Jubilee as a dealer. She was working “stand by” until about a month before the accident when she was put on full time. She enjoyed her job at the casino, she described it as exciting and a pleasure. In order to get the job at the casino, Ms. Thom worked full time at Wal-Mart and went to school at night. Before the Wal-Mart job, she worked mostly for insurance companies or brokerages in the actuarial department.
|1BIn high school she excelled in math, and was inducted into the math honor society as a sophomore. However, since the accident she has lost most of her math skills. She stated that she has trouble making change and can no longer do her job as a dealer.
She testified that she twisted her back in 1975 and was out of work for several weeks. However, that injury was resolved. She had a hysterectomy in 1981 and was on hormone replacement therapy from 1995 until her insurance lapsed after the accident. Now she can no longer afford the therapy. In the 1980’s she had a migraine headache and high blood pressure. She takes Inderal which alleviates that problem.
Ms. Thom stated that she worked until 1984 when she married and became a mother to her husband’s three children. Subsequent problems caused a separation in 1992 and a divorce in 1993. At the time of the separation, Ms. Thom moved in with her sister and began working at Wal-Mart. She was putting her life back together and was pleased to be selected as a candidate for dealer school.
She further testified that she is unable to get hospitalization now because of her mental health problems. She stated that she still has problems getting behind the wheel of a car. She is very tense and suffers numbness in her hands because of the grip she has on the steering wheel. She is now employed as a prep cook in a small restaurant. She has developed arthritis in her ring finger as a result of the repetitive chopping.
Ms. Thom’s testimony relating to her medical history and experience corroborated the testimony given by her various treating physicians. She further stated that she could hold employment in which she would not have |Mto make quick decisions. She can accomplish tasks which are structured, such as following recipes and cooking. She can no longer deal cards at the casino or process inventory at Wal-Mart as she was able to do before the accident.
Before the accident she engaged in various physical activities such as skating, gardening, dancing, and playing games with her great nieces and nephews. She can no longer do any of those things. She lacks the physical strength she had before and she is plagued by pain and pressure in her forehead. She has gained weight and still has pain when she sneezes or coughs. Her mental fogginess causes her frustration and disappointment. She is concerned that she will lose her independence and will be unable to take care of herself.
The plaintiff also presented testimony from Lawrence Thom, Ms. Thom’s former husband. He stated that during the nine years of their marriage, Ms. Thom did not complain of shoulder pain or forehead pain. She had one severe headache which was caused by high blood pressure. Mr. Thom described his former wife as an active, energetic mother for his three children. She had no problem with noise and her memory was good. ' The couple and their children engaged in physical activities such as bicycle riding, swimming and jump rope. She was congenial and happy.
Dawn Green, Ms. Thom’s niece, offered testimony which substantiated that of other family members in describing Ms. Thom as an active, intelligent, congenial individual before the accident. Her testimony further corroborated previous testimony concerning the adverse changes in ability and *998 personality Ms. Thom endured as a result of the accident.
121 The record contains the video deposition of Robert Bourng, Ms. Thom’s current employer at Robert’s Restaurant. He testified that Ms. Thom has worked for him for about a year and a half. She comes in four days a week for about three to five hours to make cole slaw and some desserts. She has her own key and comes and goes on her own terms. Her job requires low intelligence and skill. Mr. Bourng described Ms. Thom as honest and willing to work. However, she gets confused and frustrated easily. She would never be able to move up to cook or waitress. Her level of frustration is high and her tolerance for stress is low.
The defense called Dr. Rennie Culver, a forensic psychiatrist, who examined Ms. Thom once on March 26, 1996 for one hour and fifty minutes. He testified that, after that examination and a review of her records, his opinion was that Ms. Thom did not suffer from post-traumatic stress disorder. Further, he did not find any evidence of organic brain syndrome or brain damage. She was completely oriented, had excellent recent and remote memory. Her retention and recall, and thought processes were normal. The only abnormality in the clinical presentation that Dr. Culver detected was an anxiety, which could have been situational. Dr. Culver concluded that Ms. Thom suffered a concussion in the accident which caused no residual effects.
The defense also called Dr. William Black to the stand. Dr. Black is a professor of psychiatry and neurology at Tulane Medical Center. Dr. Black was qualified as an expert in neurology. Dr. Black testified that he did an evaluation of Ms. Thom and in which she was polite, friendly and cooperative. As a result of the evaluation, Dr. Black concluded that her IQ, l^was within the normal range with no suggestion of a decline. He found no evidence of cognitive dysfunction in any area tested. He found no deficit in language, writing, or memory. He further testified that he found no evidence of exaggerating, fabricating or malingering. The personality assessment showed that she was not exaggerating her physical symptoms. She did display a mild to moderate level of anxiety, and a mild level of clinical depression.
Dr. Black agreed with other defense witnesses that Ms. Thom did not suffer from Post-Traumatic Stress Disorder or brain damage. Although, Dr. Black was not certain that Ms. Thom could return to her former employment as a casino dealer, he considered her current employment as a prep cook to be underemployment.
Dr. Thomas Meunier, a vocational rehabilitation counselor also testified for the defense. He evaluated the plaintiff and concluded that her motivation was “quite good”. He further testified that the results of his evaluation showed that Ms. Thom had a strong interest in social, conventional and artistic occupations. The closest profile occupationally would be office or clerical positions like typist, receptionist, medical record clerk, cashier, teller, or accounting clerk.
He stated that Ms. Thom may have a problem returning to her employment as a casino dealer because of her slowed psy-chomotor speed after the accident. She does, however, have transferrable skills which would allow her to do casino-related work without being retrained. For example, Ms. Thom could return to accounting clerk work. She is also capable of functioning as sales clerk, cashier or receptionist, in his opinion.
[MPr. Meunier further testified that his research showed that such jobs were available in her geographical area, and the expected rate of pay would be about eight dollars per hour.
The defense also offered the deposition of Dr. Kenneth Boudreaux, an economist. He testified that he reviewed Ms. Thom’s employment history, her earnings from her employment at the casino, and reports by Professor Wolfson and Dr. Meunier. He calculated Ms. Thom’s work-life expec *999 tancy to be 26-3/4 years. Her total income in 1993 was $6,170.00 and in 1994 it was $6,482.00. Based on increases in the average worker’s income in general, her earnings capacity at the time of trial was $6,282.00. Based on Dr. Boudreaux’s calculations, the actual amount of past lost wages between the accident and the trial is $13,775.19 pre tax and $12,721.39 after tax. He testified that he was told to assume she could resume her previous employment. Based on that assumption, he did not calculate future lost wages. On cross-examination Dr. Boudreaux conceded he did not have any records of Dr. Denny, Bobby Roberts, Dr. Susan Andrews, or Dr. Black. He admitted the calculations would be different if he was instructed that plaintiff could only earn less than before the accident. Assuming she had the ability to earn $12.95 per hour, offset with her present income of minimum wage, her pre-tax loss is $108,889.00 from the date of the accident. The after tax figure would be lower by about 15-18%. The present value of future losses would be $374,505.00. That figure does not take into consideration the additional cost of purchasing private health insurance. That loss would be $54,000.00.
194Pr. Robert Steiner, an orthopedic surgeon, was called by defendants. Dr. Steiner testified that he examined Ms. Thom on April 15, 1996. At that time he took a complete history from Ms. Thom, and reviewed her medical records. Ms. Thom complained of pain in her chest, neck, forehead, and right shoulder. She also reported diminished motion in the shoulder, and numbness in her hands.
His examination revealed no spasms of the neck muscles. The upper extremity and neurologic testing revealed no weakness in the muscles of her arms or hands, and no loss of sensation to light touch. Examination of the right shoulder revealed healed orthroscopic portal incisions. The anterior and lateral aspect of the rotator cuff were tender to the touch. Active range of motion was limited with abduction 120, flexion 110. There was tenderness upon palpation of the chest area.
Based on his review of the records and his examination of Ms. Thom, Dr. Steiner opined that she sustained a contusion to her forehead and a cervical strain. She had some mild degenerative changes on her neck x-rays consistent with her age group. It was apparent that she had undergone an arthroscopy for a debridement of synovitis in her right shoulder. She also had a debridement of a partial rotator cuff tear. Dr. Steiner felt that Ms. Thom had sustained an injury to the sternum. Some degenerative and hypertropic changes were noted upon palpation and x-ray of the sternum. She also had degenerative lumbar disk disease, which preexisted the accident.
Considering those findings, Dr. Steiner felt that Ms. Thom should avoid heavy activities such a repetitive bending, stooping, twisting, and | ¡^lifting. She can continue her job as a cook. From an orthopedic standpoint, she would be able to resume her employment as a dealer. He did not believe she needed any future surgical intervention.
Plaintiff introduced rebuttal testimony from Dr. James Denny, a psychiatrist who treated Ms. Thom after Dr. Cicinelli was unable to continue as her treating physician. He stated that he has treated the plaintiff for about one year, seeing her on a monthly basis. In response to a defense challenge to Dr. Cicinelli’s competency, Dr. Denny testified that Dr. Cicinelli, who plead guilty to a criminal charge of self-medication, was appropriate in his treatment of Ms. Thom. Dr. Denny’s diagnosis of Ms. Thom was Post-Traumatic Stress Disorder, chronic and post-concussive syndrome, and adjustment disorder with some depression.
Dr. Denny also presented evidence to rebut the testimony of defense experts. He reviewed those reports and found them lacking. Specifically, he described Dr. Culver’s report as “obviously very edited *1000 and a probable purposeful attempt to hide or diminish the patient’s PTSD symptoms”. Dr. Denny also disagreed with Dr. Black’s diagnosis. Dr. Denny testified that Ms. Thom is capable of employment only in a highly structured environment with low hours.
In brief to this court, plaintiff assigns six errors for our review. Four of the six concern the amount of damages awarded and the final two concern the award of expert fees and costs.
In the first two assignments, Ms. Thom asserts the trial court erred in the award of lost wages. In the reasons for judgment the trial court explained:
las... Of particular import to this Court was the plethora of testimony from Ms. Thom’s physicians reflecting the pain and suffering she endured over a considerable period of time. Additionally, the record reveals that prior to this accident plaintiff was an active vibrant woman who was working as a full time dealer at the Jubilee Casino. However, since the accident she is unable to function as she had before.
The testimony of Dr. Thomas Krefft, who qualified at trial as an expert in the field of neurology, reflects that plaintiff has in fact suffered frontal lobe damage to her brain. Additionally, Susan Andrews, a neuropsychologist, and Brenda Crawford, a speech pathologist, testified that plaintiffs frontal lobe functions are now deficient.
With reference to Ms. Thom’s claim for loss of past and future wages, the records reveals (sic) that at the time of the accident she was making $5.50 per hour and $7.25 per hour in tips as a full time dealer and that she has been unable to return to such employment. Melvin Wolfson, who qualified as an expert economist at trial, testified that based upon this evidence plaintiff should earn approximately $26,000.00 per year. However, since the accident she has only been able to earn $4,000.00 to $5,000.00, as a prep cook. Thus, her lost wages would equal $20,000.00 a year. Based upon the foregoing, Mr. Wolfson was able to calculate the amount of past and future lost wages for Ms. Thom....
The court awarded $42,325.00 in past lost wages and $40,000.00 in future lost wages.
As to the past lost wages, plaintiff argues that the trial court should have pro-rated the $20,000.00 per year figure from the date of Dr. Wolfson’s testimony on September 8, 1997 to the date of judgment, January 20, 1999. As to future lost wages, the plaintiff argues the court erred in arbitrarily reducing the award suggested as appropriate by Dr. Wolfson to $40,-000.00.
In Mathews v. Dousay, 96-858 (La.App. 3 Cir. 1/15/97), 689 So.2d 503, 513[1] the court stated as follows:
| ctTo recover for actual wage loss, a plaintiff must prove the length of time missed from work due to the tort and must prove past lost earnings. Past lost earnings are susceptible of mathematical calculation from evidence offered at trial. An award for past lost earnings requires evidence as reasonably establishes the claim, which may consist of the plaintiffs own testimony. An award for past lost earnings is not subject to the much-discretion rule when it is susceptible of mathematical calculation from documentary proof. The plaintiffs uncorroborated, self-serving testimony will not be sufficient to support an award if it is shown that corroborative evidence was available and was not produced. To obtain an award for future loss of earning capacity, a plaintiff must present medical evidence that indicates with reasonable certainty that a residual disability causally related to the accident exists. Future loss of earnings, which are inherently speculative, must be proven with a reasonable degree of certainty, and purely conjectural or uncertain fu *1001 ture loss of earnings will not be allowed. [citations omitted].
In the case before us, the medical and economic evidence presented by the plaintiff is supportive of an award of past and future earnings loss. It is clear from the reasons for judgment, that the trial court accepted the medical and economic evidence presented by the plaintiff and made findings of fact consistent with that evidence. The trial court awarded damages of past lost wages and loss of benefits in accordance with Dr. Wolfson’s testimony. It is only in the award of future lost earnings that the trial court deviated from Dr. Wolfson’s evidence. There is no reason given for that deviation.
Given the applicable law and the reasons for judgment, we find the trial court erred in its award of damages for lost earnings. We find that the award of past lost wages in the amount of $59,568.00 is appropriate. We calculate this figure using Dr. Wolf-son’s testimony that Ms. Thom’s lost earnings were $42,325.00 as of the time of his testimony. We then pro-rated the annual lost earnings amount of $20,000.00 between the time of the |?iRtestimony on September 8, 1997 and the date of the judgment on January 20,1999.
We also find that the trial court erred in the award of future lost earnings. As previously stated the trial court awarded $40,000.00 for future lost earnings. In view of expert testimony offered at trial, we amend the award of future earnings to $70,000.00 in accordance with evidence offered by Dr. Wolfson, as adjusted for the date of judgment.
In the third assignment of error Ms. Thom argues that the court erred in failing to award damages for future medical bills. Plaintiff bases this argument on the testimony of Dr. Denny that Ms. Thom will need future psychiatric help. There is also testimony from Dr. Cieinelli which supports this recommendation. Further, Mr. Roberts opined that plaintiff would need a work adjustment program to help her cope with the frustration of not being able to remember some tasks.
In order to recover future medical benefits, the plaintiff must prove that these expenses will be necessary and inevitable. Future medical expenses must be established with some degree of certainty and must be supported with medical testimony and estimation of probable cost. Hopstetter v. Nichols, 98-185 (La.App. 5 Cir. 7/28/98), 716 So.2d 458, 462, writ denied, 98-2288 (La.11/13/98), 731 So.2d 263. Given the evidence presented at trial, we find the trial court abused its discretion to award damages for future medicals. Given the record in this matter we find an award of $1,500.00 for future medicals is appropriate.
The fourth assignment relates to the trial court’s award of $250,000.00 in general damages. Plaintiff’s argument in this assignment is twofold. | ^Plaintiff argues that the trial court only awarded damages for loss of enjoyment of life and failed to award damages for pain and suffering, and plaintiff asserts the general damage award is too low.
The award of general damages is within the vast discretion of the trial court. Recently, the Louisiana Supreme Court discussed the standard of review of awards of general damages. In Andrus v. State Farm Mut. Auto. Ins. Co., 95-0801 (La.3/22/96), 670 So.2d 1206, 1210, the court stated:
In appellate review of general damage awards, the court must accord much discretion to the trial court judge or jury. Reck v. Stevens, 373 So.2d 498 (La.1979). The role of an appellate court in reviewing awards of general damages is not to decide what it considers to be an appropriate award, but rather to review the exercise of discretion by the trial court. Id. Only if the reviewing court determines that the trial court has abused its “much discretion” may it refer to prior awards in similar cases and then only to determine the highest or lowest point of *1002 an award within that discretion. Coco v. Winston Indus., Inc., 341 So.2d 332 (La.1976).
Because discretion vested in the trial court is “great,” and even vast, an appellate court should rarely disturb an award of general damages. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993). Reasonable persons frequently disagree about the measure of general damages in a particular case. It is only when the award is, in either direction, beyond that which a reasonable trier of fact could assess for the effects of the particular injury to the particular plaintiff under the particular circumstances that the appellate court should increase or reduce the award. Id.
The award of general damages is listed in the end of the reasons for judgment as merely an award for loss of enjoyment of life, we find no abuse of the trial court’s discretion in the amount of this award. However, we find error in the trial court’s failure to award damages for pain and suffering. After a review of the evidence presented at trial, we award $100,000.00 for pain and suffering.
| snIn the final two assignments of error plaintiff asserts the award for expert fees and costs are inadequate. At the hearing to set fees and costs the court heard arguments of both parties and the testimony of plaintiffs counsel. In conjunction with that testimony, two exhibits were introduced into evidence. The documents supporting the testimony show that plaintiff incurred $18,444.00 in expert witness fees and $8,781.05 in costs. We believe the trial court abused its discretion in not awarding plaintiff the full amount represented by these exhibits. Accordingly, we amend the judgment to award expert fees in the amount of $18,444.00 and costs in the amount of $8,781.05.
As previously stated the defendant has filed an appeal in this matter. The only issue raised by that appeal is quantum. There were no issues raised as to finding of medical facts made by the trial court. Considering the narrow focus of this appeal and the findings of this court discussed infra, the claim of the defendant that the damages are excessive is without merit.
For the foregoing reasons, we amend the judgment to award $59,568.00 in past lost wages, $70,000.00 in future lost earnings. Further, we amend the judgment to award $100,000.00 in pain and suffering and $1,500.00 in future medicals. We further amend the judgment to award $18,444.00 in expert witness fees and $8,781.05 in costs. In all other respects we affirm the judgment. Costs of this appeal are assessed to defendants.
JUDGMENT AMENDED AND AS AMENDED, AFFIRMED.

. See also, Wehbe v. Waguespack, 98-475 (La.App. 5 Cir. 10/28/98), 720 So.2d 1267, 1275.