718 So.2d 511 (1998)
William CABALLERO and Agatha Caballero, Individually and on Behalf of Their Minor Child, Jennifer Caballero
v.
CATHOLIC MUTUAL INSURANCE COMPANY, The Roman Catholic Church of the Diocese of Baton Rouge, Inc., St. Francis Xavier Interparochial School Board, Inc., Gwendolyn Hall, Individually and as Tutrix of Her Minor Child, Andrea Hall and XYZ Insurance Company.
No. 97 CA 1458.
Court of Appeal of Louisiana, First Circuit.
June 29, 1998.
Rehearing Denied August 28, 1998.
*513 Charles R. Moore, Baton Rouge, for Plaintiffs-Appellants.
Roy Maughan, Jr., Baton Rouge, for Defendants-Appellees Roland, Andrea, and Gwendolyn Hall.
Daniel Atkinson, Jr., Baton Rouge, for Defendants-Appellees Roman Catholic Church of Diocese of B.R., St. Francis Xavier Interparochial School Bd., and St. Aloysius Interparochial School Bd.
Before LOTTINGER, C.J.,[*] and SHORTESS and FOGG, JJ.
SHORTESS, Judge.
On October 15, 1992, the St. Aloysius eighth-grade-girls' basketball team beat St. Francis Xavier's team 41 to 6. Following the game Jennifer Caballero, one of the St. Aloysius team members, was intentionally kicked in the knee by Andrea Hall, one of the St. Francis players. Jennifer's parents, William and Agatha Caballero, filed suit against Hall's father, Roland Hall,[1] as well as The Roman Catholic Church of the Diocese of Baton Rouge, Inc., the St. Francis Xavier Interparochial School Board, Inc., and the St. Aloysius Interparochial School Board, Inc. (defendants). (The Caballero family is hereafter referred to as plaintiffs.) They sought damages on Jennifer's behalf for her injuries, as well as damages for their own loss of consortium and reimbursement for Jennifer's medical expenses.[2] After a jury trial, judgment was rendered in favor of plaintiffs against only Roland Hall. Plaintiffs' claims against the remaining defendants were dismissed. Plaintiffs appeal the dismissal of those defendants.
Plaintiffs contend two prejudicial errors entitle them to a de novo review. Specifically, plaintiffs contend the trial court permitted defense counsel to appeal to the jury's passions and prejudices and the jury failed to apply the law due to a philosophical difference of opinion and misleading jury instructions. In the alternative, plaintiffs contend the decision of the trial court was manifestly erroneous.

DID THE TRIAL COURT IMPROPERLY ALLOW DEFENSE COUNSEL TO APPEAL TO PASSION AND PREJUDICE IN CLOSING ARGUMENT?
Plaintiffs complain about two statements made by defense counsel during closing argument. The first statement was made at the beginning of defense counsel's closing argument, in response to plaintiffs' counsel's argument that it took courage for plaintiffs to file this lawsuit. Defense counsel stated:
I would submit to you that it doesn't take courage to file a lawsuit.... When you file a lawsuit, supposedly, you have legitimate claims against the parties you're suing. And I believe this was a legitimate lawsuit as against the Halls. Beginning when I was referred this case for defense did not feel there was a legitimate claim against the diocese or the schools and I feel that way now.
Plaintiffs' counsel objected to this statement. The trial court sustained the objection. Thereafter, plaintiffs' counsel did not ask that the jury be admonished.
The second statement plaintiffs find objectionable concerned the effect of schools' obligations to pay judgments arising from criminal acts on their premises. Defense counsel stated:

*514 Ladies and gentlemen, both public schools, parochial schools, private schools in this day and age they have great responsibilities. They are trying to educate our children. They are trying to run schools day to day with the limited funds  [Plaintiffs' counsel objects to appeal to sympathy; overruled.]
They have a lot of obligations but they don't have an ... obligation to perceive criminal acts that are going to occur on their premises when they have no reason to believe that such an event is going to occur. If we are going to hold schools liable for this type of situation and ask them to pay a lot of money, then we're going to have a problem with our schools and our system.
[Plaintiffs' counsel again objects to appeal to sympathy; overruled.]
This is a case about money, ladies and gentlemen. This is a lawsuit seeking money. And there is nothing wrong with that. The [plaintiffs] are entitled to do that. They are entitled to get money from the responsible person. That person is Andrea Hall and her parents. But the school is not responsible. The diocese is not responsible.
Counsel has great latitude in argument before a jury, subject to regulation and control by the court, whose duty is to confine argument within proper bounds.[3] While arguments of counsel should be confined to the issues in the case on trial, to the evidence and fair and reasonable deductions therefrom, and to arguments of opposing counsel, generally speaking liberal freedom of speech should be allowed.[4] The parties are, however, entitled to a fair trial uninfluenced by appeals to passion and prejudice.[5] But appeals to sympathy, as long as they are based on the facts in the case, are not ordinarily considered improper and furnish no ground for complaint. Some flights of eloquence, and the introduction of some touches of pathos in the discussion of the case, are considered to be within the general constraints of permissible argument.[6] Generally, the financial burden imposed upon a defendant by a jury verdict is not an appropriate concern for jury consideration.[7]
The propriety of argument in a civil jury trial must be determined in light of the facts of the particular matter, the conduct and atmosphere of that particular trial, and the arguments of opposing counsel.[8] The trial court is in a better position than an appellate court to determine possible prejudicial effects resulting from counsel's argument before a jury, and its rulings will not be reversed absent abuse of discretion.[9]
We find the corrective action taken by the trial court in response to the first statement complained of, i.e., sustaining plaintiffs' objection, was sufficient. The comment was not so unreasonable or unfair as to deprive plaintiffs of a fair trial, and plaintiffs failed to ask the trial court for further corrective action at the time it could have been done.
Plaintiffs classify the second statement, which the trial court did not find objectionable, as a "message that the `education of your children will be diminished if you hold the school liable.'" Defendants counter that the remarks conveyed a consistent and reasonable view of the evidence at trial, i.e., that the school representatives had no reason to perceive a criminal act was going to occur, and that they should not be required to pay money to plaintiffs because of unforeseen criminal acts.
The trial court was in a better position than this court to determine the intended meaning of defense counsel's remarks. The trial court obviously did not deem these remarks *515 an appeal to consider the financial burden a judgment against the schools and diocese would impose. Considering the facts and circumstances of this case, the conduct of this particular trial, and the arguments of opposing counsel, we find no abuse of the trial court's discretion.

DID THE TRIAL COURT ERR IN NOT CHANGING ITS JURY INSTRUCTIONS IN MID-DELIBERATIONS?
The trial court used plaintiffs' proposed jury charge regarding liability of the school boards. That charge provided, in pertinent part:
A school board, through its agents and teachers, has a duty to adequately supervise students and thereby protect them from injury.... In order to find a school board liable for the torts of a student, there must be a showing of a dereliction of duty by the instructors or administration leading, in turn, to an injury or damage occasioned by their charges....
... A school employee is liable in damages if it is shown that he or she, by failing to exercise the degree of supervision required by the circumstances, did not prevent the act which caused the damage and it could have been reasonably pre[v]ented had they done so.
(Emphasis added.)
After approximately three hours of deliberation, the jury sent a note to the trial court stating it had a question regarding liability. Plaintiffs' counsel suggested the charge he had prepared was unclear and asked the court to instruct the jury that the words "agents and teachers" included "coaches and workers." Plaintiffs' counsel also asked the court to change the phrase "school employee" to "school board." The court declined to do so. Instead, it reread its original charge on liability. The jurors advised the court this had resolved their problem.
A party may not assign an error regarding a jury instruction unless he objected thereto either before the jury retired to deliberate or immediately thereafter.[10] Plaintiffs' counsel's objection to the charge he prepared three hours after the jury had begun deliberations came simply too late.
Furthermore, we agree with the trial court that to change the jury charges at that point would have provided undue emphasis on that issue. The court stated:
The changing up of the jury charges right now, I'm afraid, will invoke attention and change up what the jury has been told; and I think it will provide added emphasis on certain areas. And I'm not sure that they're confused about that. So I think that in regard to the jury charges, unless the jury gives me a note that they're hung up on something else, I think I'm going to stay with what we have right now.
The trial court did not err in refusing to change its original jury instructions in middeliberation. This assignment of error is without merit.

WAS THE TRIAL COURT MANIFESTLY ERRONEOUS IN FINDING DEFENDANTS WERE FREE FROM FAULT?
Many of the facts surrounding this incident are disputed. What is not in dispute is that the St. Aloysius team beat the St. Francis team 41 to 6; that the game was played at St. Aloysius, and that Andrea Hall intentionally kicked Jennifer Caballero in a short hallway between the locker room and the lobby, in the presence of the entire St. Aloysius team, after the St. Aloysius coach had met with the players in the locker room and released them to return to their parents.
The dispute in this case centers around the entire tenor of the game and whether it was foreseeable that a St. Francis player would attack a St. Aloysius player. According to plaintiffs, the St. Francis team members cursed at and brutalized the St. Aloysius players during the game to such an extent the coaches and referees should have stopped the game. Barring that, according to plaintiffs, the St. Aloysius coach should have personally escorted each of his players to her parents after the game. Plaintiffs contend the referees failed to maintain control of the game, the St. Aloysius coach failed to stop *516 the game or to safely deliver each girl to her parents after the game, and the St. Francis coach failed to restrain Hall from committing a violent act after the game.
Defendants contend the St. Francis team was lacking in basic basketball skills, but its members did not intentionally assault the St. Aloysius team during the game. They further contend that the game was not so abnormally rough that the referees or coach should have stopped it, and that the action of Hall was totally unforeseeable.
The jury, in response to special interrogatories, found the diocese, the two school boards, and their representatives and employees were not negligent. Plaintiffs contend this factual finding was manifestly erroneous.
The standard of appellate review of factual findings is a two-part test: 1) the appellate court must find from the record there is a reasonable factual basis for the trial court's finding, and 2) the appellate court must further determine the record establishes the finding is not clearly wrong (manifestly erroneous). Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). Factual findings should not be reversed on appeal absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If the trial court's findings are reasonable in light of the record reviewed in its entirety, the court of appeal may not reverse. Sistler v. Liberty Mutual Ins. Co., 558 So.2d 1106, 1112 (La.1990). Consequently, when there are two permissible views of the evidence, the fact-finder's choice between them cannot be manifestly erroneous or clearly wrong. Housley v. Cerise, 579 So.2d 973, 976 (La. 1991); Sistler, 558 So.2d at 1112.
After a thorough review of the record, we find a plethora of evidence supporting defendants' version. Bart Saia, the St. Aloysius coach, testified he saw no intentional fouls and although the players told him they were being cursed, he never heard a St. Francis player curse. He stated that at half time his players did not want to go back on the court because the St. Francis players were committing many fouls, but after he talked to the officials he was not concerned about the girls' safety because he "knew things were going to be cleaned up." The referees called a much "tighter" game in the second half, and his team had less complaints. After the game, when the girls were supposed to shake hands in a sportsmanlike manner, the St. Francis girls did so aggressively, which concerned Saia. When he released the girls from the locker room, however, he had no concern that an incident might occur because knew the girls' parents were in the lobby.
Ethel Jackson Matthews was the unpaid volunteer assistant coach of the St. Francis team at the time of this incident. The head coach had to attend a funeral on the day of this game, so Matthews acted as head coach for this game. She stated the game was normal. She saw none of her players try to intentionally injure the St. Aloysius players. She had no prior disciplinary problems with Hall.
The three referees involved in this game also testified. None of them recalled anything unusual about this game.
All three plaintiffs testified. Jennifer Caballero testified she felt fear and anxiety during the game because of the St. Francis players (not Hall) cursed and glared at her when she cheered her team from the bench. In her opinion, the referees were not controlling the game. She asked her parents and the coach to take her out of the game at half time, but they all told her she was being ridiculous. When she left the locker room after the game, she was still scared, but she did not think one of the St. Francis players would physically assault her until the moment before the incident happened, when she saw Hall's leg in a kicking position.
Agatha Caballero felt the St. Francis players were being unnecessarily rough and the referees were not controlling the game, but she was never concerned enough to remove her daughter from the game. She did not feel any sense of urgency or danger that something might happen to Jennifer after the game.
William Caballero testified the St. Francis team was intentionally playing rough, and in his opinion the referees were not controlling the game. He is legally blind, however, and watched the game through binoculars. He admitted he could tell his daughter from *517 the other players only by her kneepads. He did not hear the St. Francis players curse during the game. He stated Jennifer came to him in the stands at half time and asked to be taken from the game because she thought the St. Francis players were going to hurt her. He told her not to "be ridiculous"; she was playing at her home school and "[n]obody is going to hurt you here." According to Mr. Caballero, Jennifer came to him after the game and said she was scared, but he was not concerned for her safety.
Three mothers of St. Aloysius players and three of the team members testified. Robbie Bagley's daughter Danielle was on the St. Aloysius team. Bagley testified Danielle was not hit or tripped in the game. She stated she did not hear any cursing during the game. Danielle testified the other St. Aloysius players said they had been cursed at, but she did not hear any cursing herself. She was never tripped or pushed, and she was not scared during the game. She stated she never had any reason to believe an incident would occur, that in the locker room no one expressed fear that someone would be injured, and that the incident took her by surprise.
Marcia S. Dugas, mother of one of the "star players" for St. Aloysius, felt the game was "like a brawl." She thought the referees failed to control the game, but she could not say any St. Francis player intentionally tried to injure a St. Aloysius player, and she did not hear any cursing. She suspected "something would happen" after the game, but that something "could have been anything.... I couldn't predict...."
Marilyn Dietz, another St. Aloysius player's mother, testified she did not find this game to be abnormal in any respect. She heard no cursing and saw no intentional shoving, pushing, kicking, or tripping by the St. Francis players. Her daughter showed no sign of fear during the game. She did not suspect anything might happen between the St. Francis players and the St. Aloysius team members.
Ashley Blouin, a point guard for St. Aloysius, did not recall any specific incidents of pushing, shoving, or tripping during the game, or of anyone cursing or glaring at her. She also did not recall being scared during the game that she or one of her friends might be injured.
Abigail Sheffield, another St. Aloysius point guard, testified she personally was not afraid during the game. She never felt there was a threat of the St. Francis players doing anything to them. No one was injured during the game, and there was no "atmosphere of fear" in the locker room. She testified, "We weren't expecting anything out of the ordinary to happen...."
The mother of one of the St. Francis players also testified. Loraine Bienville, who was floor supervisor of the game for St. Francis, stated she attended quite a few of her daughter's basketball games, and this game seemed like a normal game to her. When asked if she felt the St. Francis players were overly aggressive, she replied, "Definitely not." From her standpoint, this incident was "totally unexpected."
Based on this evidence, we find it was a permissible view of the evidence that this incident was totally unforeseeable and that the agents and employees of the diocese and the school boards were not negligent. Finding no manifest error in the jury's verdict and the trial court's judgment, we affirm at plaintiffs' costs.
AFFIRMED.
NOTES
[*] Lottinger, C.J., retired on July 15, 1998, and thus did not consider this rehearing.
[1] Plaintiffs originally sued Hall's mother, Gwendolyn Hall, alleging she was Hall's custodial parent. They later amended the petition to substitute her father, Roland Hall, stipulating the Halls were married and had never been divorced.
[2] Plaintiffs also sued Catholic Mutual Insurance Company and XYZ Insurance Company. Plaintiffs voluntarily dismissed Catholic Mutual, and a real party was never substituted for XYZ.
[3] Temple v. Liberty Mutual Ins. Co., 330 So.2d 891, 894 (La.1976).
[4] 75A Am.Jur.2d Trial § 554 (1991 & Supp. 1998).
[5] 75A Am.Jur.2d Trial § 648 (1991 & Supp. 1998).
[6] 88 C.J.S. Trial § 191 (1955 & Supp.1997).
[7] 75A Am.Jur. Trial § 672 (1991 & Supp.1998).
[8] Luquette v. Bouillion, 184 So.2d 766, 771 (La. App. 3d Cir.1966).
[9] Temple, 330 So.2d at 894.
[10] La. C.C.P. art. 1793(C).