804 So.2d 11 (2001)
Douglas A. ABADIE, et al.,
v.
METROPOLITAN LIFE INSURANCE COMPANY, et al.
Addressing Individual Appeals: Patrick Henry Clark.
Nos. 00-CA-352, c/w 00-CA-344 to 00-CA-856.
Court of Appeal of Louisiana, Fifth Circuit.
April 11, 2001.
*14 Robert E. Caraway, III, Plauché, Maselli, Landry & Parkerson, New Orleans, LA, Attorney for Defendants/Appellants, Steven Kennedy, Peter Territo, and American Motorists Insurance Company.
Mary L. Dumestre, Marjorie M. Campbell, Stone, Pigman, Walther, Wittmann & Hutchinson, L.L.P., New Orleans, LA, Attorneys for Defendants/Appellants, Avondale Executive Officers, Samuel M. Rosamond, Fleming & Rosamond, Metairie, LA, Attorney for Defendant/Appellant, Commercial Union Insurance Company.
Thomas G. Milazzo, James L. Fletcher, Jr., Pamela B. Gautier, LeBlanc, Miranda, Warwick & Milazzo, Metairie, LA, Attorneys for Defendants/Appellants, Asbestos Corporation Limited.
*15 J. Burton LeBlanc, IV, Cameron R. Waddell, Brian F. Blackwell, Sandra A. Jelks, Dawn Smith Rodrigue, Steven M. Jupiter LeBlanc, Maples and Waddell, L.L.C., and Robert E. Arceneaux, Barham & Arceneaux, New Orleans, LA, Attorneys for Plaintiffs/Appellees.
Panel composed of Judges DALEY, EDWARDS, and LOBRANO, Pro Tem.
EDWARDS, Judge.
The present action was one of numerous lawsuits in this consolidated appeal for damages caused by asbestos exposure. It was originally grouped with several appeals of other plaintiffs. Because we consider here a plaintiff who died of mesothelioma, we determined to address this appeal separately from the asbestosis cases.
Patrick Clark, his spouse, and children originally filed suit against Avondale Executive Officers and certain asbestos product manufacturers in West Baton Rouge Parish on March 22, 1995 for damages due to the plaintiff's exposure to asbestos over several years. As explained in our seminal opinion discussing the Common Issues and several other plaintiffs, the present suit is one of over one thousand individual lawsuits by plaintiffs exposed to asbestos. The cases were consolidated for trial and following various procedural determinations, the claims of 129 Avondale employees were tried before one jury. Mr. Clark suffered from mesothelioma, a fatal signature disease related to asbestos exposure. On June 13, 1995, the case was transferred to the Twenty Fourth Judicial District Court on motion of the plaintiffs, and on June 15, 1995, plaintiffs moved for an expedited trial, averring that Mr. Clark was not likely to live for six months. Mr. Clark passed away on that day, June 15. The motion was granted and the case consolidated for trial with the group of plaintiffs whose trial was set for September 15, 1995. For the additional historical and procedural background of the consolidated action, see Abadie v. Met. Life Ins. Co. et al., 00-344 (La.App. 5th Cir.3/28/01), 784 So.2d 46.
Prior to trial a number of defendants settled.[1] Trial proceeded against the remaining (then) viable defendants Westinghouse, Pittsburgh Corning, Owens Corning, A.P. Green, Armstrong, GAF, National Gypsum, and the Avondale executive officers O'Donnell, Chantrey, Kelmell, Kennedy, and Territo. The jury returned a verdict in favor of Mr. Clark and against all remaining defendants except Kennedy. The jury also made determinations of the fault of the various settled asbestos product manufacturers. The jury awarded damages of $2,641,330.00 on the survival action, and on the wrongful death action, Mrs. Clark was awarded $488,780.00, and her daughter and son were given $289,000.00 and $259,000.00 respectively. A judgment in accordance with the jury verdict was rendered on May 13, 1996.
Pursuant to motion, the trial court granted a JNOV on December 9, 1996, amending the jury verdict judgment by granting JNOVs in favor of nine settling defendants, finding that no reasonable juror could have found them liable to the plaintiffs, and removing them from the virile share calculation of each plaintiff.
Westinghouse, the Avondale Officers, and their insurers perfected the present appeal. A number of the specific assignments of error have been previously addressed *16 in the prior opinion, Abadie et al., and when appropriate we have adopted those findings here. Briefly, for the sake of the viable appellants, we found that the executive officers O'Donnell, Kennedy, Chantrey, and Territo had a duty to the plaintiffs under Canter v. Koehring Co.[2] to provide a safe workplace and that they breached that duty. George Kelmell and J.D. Roberts were dismissed from all consolidated suits for insufficient evidence.
In our previous opinion, we determined that the JNOVs granted in favor of four of the settling manufacturers, Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool Manufacturing, would have to be reviewed on a case by case basis to determine if there was sufficient evidence presented at trial for the jury to have reasonably concluded that these defendants could be liable to specific plaintiffs for asbestos-related injuries. The JNOVs in favor of Anchor Packing, Armstrong World Industries, Flexitallic, Garlock, and Uniroyal, Inc./United States Rubber Co. were affirmed. After trial, Mr. Clark settled with OwensCorning, Pittsburgh-Corning, GAF, National Gypsum, and Armstrong. While this appeal was pending, Westinghouse settled. The remaining non-settling defendants are the Avondale executive officers.

HISTORY OF EMPLOYMENT AND EXPOSURE
Mr. Clark's testimony was preserved via his deposition which was admitted into evidence. He stated that he went to work at Avondale for various periods between January 1964-1971 or '72. In 1966, he left Avondale for a two or three-month period to work with American Can in New York. He returned home and worked for F.T.L. Construction for eight or nine months. He was not exposed to asbestos at either of the latter employment places. Mr. Clark returned to Avondale in 1967, where he remained employed until 1971 or '72. After leaving Avondale, he worked for Louisiana Power & Light Company at Waterford I and II in Taft, where there was no asbestos exposure. From there he worked at Good Hope Refinery for two or three months. Then he went to Saudi Arabia as a start up engineer for the Saudi government. After a couple of months he worked for Reilly Stoker, then returned to Saudi Arabia until 1984. After returning home, he had a couple of jobs which did not expose him to asbestos.
While at Avondale, he was an engine room mechanic who prepared boilers, pumps, fans, etc. He worked at Wet Dock# 3 which involved new ship construction, working eight hours a day, seven days a week exclusively in the hull of the ship. The area was confined, with blowers operating to lessen the heat. The ventilation system did not work then and it was dirty from all the pipe cutting, welding and insulators. The insulators worked right beside him, generating the majority of the dust. Mr. Clark stated that the ventilation system would blow air from the top side and actually create more dust, occasionally causing him a nosebleed. Sometimes the welders and pipe fitters would wet the asbestos cloth they used, and sometimes not. Periodically, Mr. Clark would tear down pipe insulation to get to leaks or do repair work, also a dusty process. He worked around the turbine, which was wrapped in asbestos blankets, and also installed gaskets, some of which had to be cut and fabricated. Mixing the insulator cement was a dusty process.
Sometimes Mr. Clark's job required him to work in other parts of the vessel, and on occasion he worked around the joiners who *17 were fabricating wall panels. When they sawed the panels, dust was created. There were laborers cleaning, but there was no way to get the dust out. Mr. Clark had dust on his clothes, and in his mouth and nose. There was no place to shower or clean up except to wash his hands.
Mr. Clark testified that no one at Avondale ever warned him about the dangers of breathing asbestos, nor could he recall any safety meetings at Avondale. Respirators were not offered to him and he could not recall if the insulators wore them. The dusty condition would last about two months, then would clear up for a time before the painters came in. At that point, they would use the air hose and blow the dust, which became so thick that you could not see. The pipe insulation was whitish or grayish, chalk hard, and half moon shaped. He remembered the brand name "Kaylo" and saw some "Johns-Manville" boxes. None of the product boxes had warning labels.
During his career at Avondale, Mr. Clark worked on the following vessels: Gulf Crater, Gulf Shipper, Gulf Merchant, Louise Lykes, Elizabeth Lykes, Ruth Lykes, Letitia Lykes, Genevieve Lykes, Mason Lykes, Mallory Lykes, Stella Lykes, Frederick Lykes, Howell Lykes, Dolly Turman, and Velma Lykes. Mr. Clark was exposed to dust on other ships not listed.
Prior to his Avondale career, Mr. Clark was in the Navy where he was stationed on the U.S.S. St. Paul for about two and one-half years. He worked in the boiler and engine rooms on that ship. The boilers on that ship were manufactured by Babcock & Wilcox.

MEDICAL HISTORY
Mr. Clark suffered shortness of breath and was diagnosed with a lung malignancy in April 1994. He had smoked less than a pack of cigarettes a day for a period of time during 1969, but had not smoked in the 25 years previous to his diagnosis. There was some continuing uncertainty at diagnosis as to whether the cancer was adenocarcinoma or mesothelioma; the former cancer is not an asbestos related disease. Dr. Richard Vial at LSU Stanley Scott Cancer Center found that Mr. Clark's x-rays showed pleural based plaque-like lesions consistent with mesothelioma, but his CT showed adenopathy more typical of adenocarcinoma. Dr. Ronald Welsh's biopsy diagnosed adenocarcinoma; Dr. Samuel Hammar felt his biopsies showed a mesothelioma which was, based on his history, caused by asbestos. Mr. Clark died on June 15, 1995. After Mr. Clark's death at the age of 53, his autopsy, performed by Dr. James Freeman, showed that he suffered from malignant mesothelioma. Dr. Freeman testified that since Mr. Clark had not smoked for 25 years, he had no greater chance of getting tumor related smoking cancers than a nonsmoker.
Dr. Philip Cagle, certified as an expert in pulmonary lung pathology, stated that based on his review of cells taken from Mr. Clark, that he suffered from adenocarcinoma. The physician did not find asbestos fibers in Mr. Clark's lungs; however, he himself did not administer the stains. Mr. Clark's death certificate showed the cause of death to be mesothelioma.
In his deposition, Mr. Clark testified that he had a cancerous tumor on his right side, and could not do the things he used to be able to do, such as fishing, camping, and activities with the Knights of Columbus. Before he was diagnosed, he owned "Northshore Home Repair and Maintenance" business. After his diagnosis, his lung had to be drained every two weeks, which was a very painful procedure. His chemotherapy began in May of 1994 and *18 continued until December 1994. He became very ill, lost his hair, and was unable to eat. Mr. Clark also underwent six to eight other procedures in which a tube was placed into his chest for drainage. Each procedure required hospitalization for three days to one week. He went to the American Cancer Institute in Oklahoma for a diagnosis and to Greece for treatment. By the time of his deposition, he was unable to dress in other than his robe, and unable to sleep due to the pain of the tumor.
His total medical expenses equaled $126,609.30.

JURY INTERROGATORIES
The jury found that Mr. Clark was occupationally exposed to asbestos and the following defendants were liable in negligence or as having products which were unreasonably dangerous per se: Owens-Corning, Pittsburgh-Corning, Westinghouse, A.P. Green, Anchor Packing, Armstrong, Babcock & Wilcox, Fibreboard, GAF/Ruberoid, Garlock, Johns Manville, National Gypsum, Rapid American, Rock Wool, Uniroyal, and UNARCO. Of the executive officers, O'Donnell, Kelmell, Territo, and Chantrey were found to have been negligent. The jury awarded Mr. Clark $2,641,330.00; Mrs. Clark was awarded $488,780.00; daughter Wanda Clark Crawford was awarded $289,000 and son Bradley Micelli was given $259,000.00.
In the May judgment on the jury verdict, the court awarded the following:
AGAINST OWENS-CORNING, PITTSBURGH-CORNING, WESTINGHOUSE, AND THE FOUR EXECUTIVE OFFICERS

SURVIVOR BENEFITS $2,054,367.70
WRONGFUL DEATH BENEFITS:
Mrs. Clark $ 380,162.21
Wanda $ 224,777.78
Bradley $ 201,444.43

IN FAVOR OF OWENS-CORNING, PITTSBURGH-CORNING, WESTINGHOUSE, AND THE EXECUTIVE OFFICERS FOR CONTRIBUTION AGAINST GAF, NATIONAL GYPSUM, A.P. GREEN, AND ARMSTRONG

SURVIVOR ACTION $747,042.80
WRONGFUL DEATH ACTION $293,230.69

Following the JNOV, the December 1996 judgment made the following awards:

AGAINST OWENS-CORNING, PITTBURGH-CORNING, WESTINGHOUSE, AND THE FOUR EXECUTIVE OFFICERS

SURVIVOR BENEFITS $2,293,663.70
WRONGFUL DEATH BENEFITS:
Mrs. Clark $ 427,682.50
Wanda $ 252,875.00
Bradley $ 226,625.

Owens-Corning, Pittsburgh-Corning, Westinghouse, and the executive officers were granted the same amounts on the contribution as in the May judgment.
The court also made certain findings on the virile shares of the settling defendants as discussed elsewhere.

WRONGFUL DEATH ACTION
Following his death, Mr. Clark's original petition was amended on July 18 to include an action for wrongful death.
Several defendants, including the Avondale interests, filed exceptions of no cause of action to the wrongful death petition averring that the claim was barred by the Louisiana Workers' Compensation laws. The motions were set, and then continued to be determined at trial. Following trial, the jury returned the above described verdict. Appellants re-urged their exception, and moved for judgment notwithstanding the verdict with respect to the survival and wrongful death claims. The Court denied the post-trial motions.
In Walls v. American Optical Corp., 98-0455, (La.9/8/99), 740 So.2d 1262, at 1270, *19 the Louisiana Supreme Court reiterated the legal proposition that the plaintiffs' injury in a wrongful death action occurs when the victim dies, and thus the wrongful death action could not arise until the date of the victim's death. In that case the Court determined that La. R.S. 23:1032 barred a wrongful death action against the executive officers based on negligence when the death occurred after October 1, 1976.[3] Plaintiffs conceded in oral argument that Mr. Clark's demise in 1995 similarly precludes their lawsuit against the Avondale Executive Officers for wrongful death allegedly caused by their negligence. For these reasons the verdict and judgment for damages against the Avondale interests on that issue must be set aside.
The assignment of error which urges that the present cause of action is barred under the Longshore and Harbor Workers Act has been found to be without merit in this court's per curiam opinion and will not be addressed further here.

STATUTORY IMMUNITY
The Avondale defendants also assert that the cause of action for mesothelioma accrued after September 30, 1976 and is therefore barred by worker's compensation statutory immunity under La. R.S. 23:1032. We have analyzed the assignment of error in our per curiam opinion as to what law generally applies in these long-latency cases. Relative to mesothelioma in particular, it has been held that in occupational disease cases such as mesothelioma cases, a survival action arises when the injured party is exposed to the toxic substances which cause the disease. Callaway v. Anco Insulation, Inc., 98-0397( La.App. 4 Cir. 3/25/98), 714 So.2d 730, 731; writ denied, 98-1034 (La.11/19/99), 749 So.2d 666. Thus the survival action is governed by the workers' compensation statute which was in effect at the time the decedent was exposed to asbestos. Mr. Clark began working at Avondale in 1964, at which time his significant exposures began, well before the 1976 amendment granting immunity to co-employees.
Various documents introduced at trial verified that mesothelioma is caused by exposure to asbestos. Dr. Herbert Abrams testified that as of 1966, there was no doubt that asbestos caused mesothelioma. Dr. Thomas Nuttli testified that mesothelioma is a dose related disease with a latency period of 20-40 years. Dr. Samuel Hammar, a lung specialist and a member of the North American Mesothelioma Panel, is a specialist in the diagnosis of cancers caused by asbestos. After conducting a biopsy, Dr. Hammar concluded that Mr. Clark died of mesothelioma, and that the cause was his shipyard exposure at Avondale to asbestos products. The autopsy confirmed that the cause of death was mesothelioma.
A court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989). The court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and further determine that the record establishes that the finding is clearly wrong (manifestly erroneous). See Mart v. Hill, 505 So.2d 1120 (La.1987). The issue to be resolved by a reviewing court is not whether the trier of fact was right or wrong, but *20 whether the fact finder's conclusion was a reasonable one. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review where conflict exists in the testimony. Rosell v. ESCO, supra; Cormier v. Comeaux, 98-2378 (La.7/7/99), 748 So.2d 1123.
Although there was testimony that plaintiff suffered from a different type of cancer, we find no manifest error in the jury's conclusion that Mr. Clark died of mesothelioma caused by asbestos. Because his asbestos exposures began well before the 1976 amendment, this cause of action is not barred in the instant case.

CONSOLIDATION
Appellants urge that the court erred in consolidating the present case to join the multi-plaintiff trial group less than three months before trial. They contend the case was rushed to trial, resulting in unfair prejudice to them and a violation of due process. Appellants allege that because of the confusion regarding the identity of settled co-tortfeasors and plaintiffs' surprise rebuttal witness, there was inadequate time to locate joint tortfeasors and to uncover important medical evidence. We note that writs were not taken in this court on the issue of consolidation.
We have determined in the main opinion that consolidation of the multiple cases was supported by Code Civil Procedure Article 1561, and that the defendants have not shown how consolidation prejudiced them. Here, although the issue varies slightly, our disposition is made on similar grounds. Avondale contends that the appearance of plaintiff's "surprise" witness, Dr. Roggli, demonstrates that there was inadequate time to uncover important medical evidence. If Dr. Roggli's testimony was indeed a surprise at trial, we are unable to determine how setting the matter for a later trial would have made a difference in "uncovering" medical information. Further, defendants had ample time to uncover the identity of settled co-tortfeasors. Finally, defendants' contention that it was unnecessary to consolidate the case since plaintiffs knew Mr. Clark would die before trial requires a certain prescience demanded of neither the plaintiffs nor the trial court. This assignment of error is without merit.

ADMISSION OF DR. ROGGLI'S TESTIMONY
Defendants complain that the trial court improperly admitted the testimony of Dr. Roggli as a rebuttal witness. In its case in chief, defendants presented the testimony of Dr. Cagle, who issued a report based on his interpretation of the slides taken by other pathologists, as well as on tissue blocks taken at the autopsy. Dr. Cagle felt that within reasonable medical probability, the presence of mucin droplets confirmed a diagnosis of adenocarcinoma rather than mesothelioma, and he opined that the test used by Dr. Hammar to diagnose mesothelioma had a false positive result. Defendants asked Dr. Cagle questions relative to his own testing techniques as they related to certain writings of Dr. Roggli. Plaintiffs contend that they intended to use Dr. Roggli's reports or his testimony to rebut Dr. Cagle's opinion (that his test was conclusive).
Defendants aver that Dr. Roggli was not identified as an expert to testify, that he did not issue an expert report prior to trial as required by the pre-trial order, and did not review Mr. Clark's tissue sample until after trial started, and thus his testimony was a complete surprise. Defendants further argue that the rebuttal testimony was presented solely to bolster the testimony of plaintiffs expert Dr. Hammar and should have been offered during the case in chief. Defendants also appear to argue *21 that Dr. Roggli's testimony exceeded the scope which the trial court allowed as the basis for admission. Although it is not specifically alleged, appellant's argument presumably pertains to the issue of the diagnosis of mesothelioma. Plaintiffs respond that the defendants broached the issue of Roggli's writings and findings by questioning their witness, Dr. Cagle, on those findings as they related to Cagle's testing techniques. Plaintiffs also assert that Dr. Roggli was not called to the stand until more than one month after the trial court stated its ruling and thus his testimony was not a surprise.
We have discussed the medical testimony relative to the finding of mesothelioma above, confining our review to evidence which does not include that of Dr. Roggli, and found it sufficient to support the diagnosis. Nevertheless, considering the merits of the assignment of error, this court has previously stated:
The trial judge has discretion in conducting a trial. He is required to do so in an orderly, expeditious manner and to control the proceedings so that justice is done. LSA-C.C.P. art. 1631. His discretion includes the order of presentation of witnesses, LSA-C.C.P. art. 1632, as well as the admissibility of a witness' testimony whether that witness is brought in rebuttal or one that was not listed on the pre-trial order. LSA-C.C.P. art. 1551. Further, rebuttal witnesses are not required to be listed on the pre-trial order.
LeBlanc v. Continental Grain Co., Inc., 95-813 (La.App. 5th Cir.3/13/96), 672 So.2d 951, 958; writ denied 96-1526 (La.10/4/96), 679 So.2d 1383 [citations omitted]. Also Tracy v. Jefferson Parish Through Dept. of Public Works, 523 So.2d 266, 274 (La. App. 5th Cir.1988).
Dr. Phillip Cagle, defendant's expert witness and a member of the Mesothelioma Panel, testified and issued a report based his interpretation of the slides taken by other pathologists, as well as on tissue blocks taken at the autopsy. He felt that within reasonable medical probability, the presence of mucin droplets in two different stains confirmed a diagnosis of adenocarcinoma rather than mesothelioma. Dr. Cagle testified that "by definition, the World Health Organization definition, a cancer that makes mucin is an adenocarcinoma." He further stated that mesothelial cells do not make mucin, whether or not they are malignant. Dr. Cagle had no doubt that the stains made were valid and accurate and that the Mesothelioma Panel does these stains for diagnosis. He further opined that the test used by Dr. Hammar to diagnose mesothelioma had a false positive result. The witness stated that he does not regularly perform electron-microscopy as Dr. Hammar did, and that method is not used much for diagnosing tumors. Dr. Cagle stated that if another test on these same tissues came back negative, then that second test was not correctly done. Dr. Victor Roggli was the author of a textbook used by Dr. Cagle and referred to by the defendants in direct examination.
Plaintiffs sought to impeach Dr. Cagle's testimony on the infallibility of the stain tests by introducing a report done by Dr. Roggli on Mr. Clark's tissue, or alternatively, by Roggli's testimony. Following argument and strenuous objection by the defense, the trial court determined to allow Dr. Roggli's testimony. The court stated its ruling: "The court is going to let the plaintiffs call Dr. Roggli for the following: to explain his text, which Mr. Cali got into with Dr. Hammar, his theory of the testing and why Dr. Cagle's testing is flawed. However, Dr. Roggli cannot testify as to the testing of Mr. Clark's tissue and the results of that testing because that is not *22 new. The other three things, items, are in response and is [sic] proper rebuttal testimony." Defendants specifically requested the court to disallow any testimony or evidence of tests done by Dr. Roggli on Mr. Clark's tissue. After reading the dialogue between the court and all counsel, it is clear that the court prohibited only testimony as to testing done by Dr. Roggli, not on that witness's interpretation of the Cagle slides.
Dr. Roggli testified that he disagreed with Dr. Cagle's testimony that the tumor produced mucin and was unequivocally an adenocarcinoma. He stated that the slides equivocally show whether mucin is present, and even if present does not disprove a diagnosis of mesothelioma. Dr. Roggli stated that the stains done by Dr. Cagle were not specific for mucin, and do not show unequivocally that the tumor was adenocarcinoma. He felt that additional studies should have been done. The additional studies done by Dr. Hammar were necessary to distinguish between the two types of tumors.
In his testimony, Dr. Roggli showed stains used only for teaching purposes. He stated that mesotheliomas can rarely produce mucin, and disagreed with Dr. Cagle's, testimony on this issue. Dr. Roggli testified that based on the pathology reports and slides that Dr. Cagle reviewed, the tumor was a mesothelioma. The results of Dr. Roggli's own testing were proffered.
Evidence in rebuttal is confined to new matters raised by the defense. Rebuttal is not a repetition of plaintiffs theory of the case. Young v. Martinez, 98-674 (La. App. 5th Cir.11/25/98), 722 So.2d 1143, citing Beecher v. Keel, 94-0314 (La.App. 4th Cir.9/29/94), 645 So.2d 666, writ denied, 95-0108 (La.3/10/95), 650 So.2d 1185.
Our review of the record discloses that the defense used a portion of a text written by Dr. Roggli on its cross-examination of Dr. Hammar, in an attempt to contradict the witness's diagnosis. The gist of Dr. Cagle's subsequent testimony was that his test stains were the only viable standard of determining mesothelioma. The court found that the defense initiated the issue of Dr. Roggli's texts and its reliance on that expert permitted explanation by the author. The defense cross-examined Dr. Roggli on his interpretation of the Cagle report and slides. On review of the record we find that the question of the "infallibility" of the stains was in the realm of rebuttal testimony and we find no abuse of discretion in the admission of Dr. Roggli's testimony. When Dr. Roggli went beyond the scope of rebuttal, defense objections were sustained, and any testimony as to his own testing was proffered outside of the presence of the judge and jury. This assignment of error is without merit.

VIDEOTAPE IN CLOSING ARGUMENT
Defendants aver that the use of portions of Mr. Clark's video deposition in closing argument was improper. They argue that the material was presented solely for its emotional effect and was a final appeal to passion and prejudice to arouse the jury. The entire videotape deposition had previously been introduced into evidence.
The propriety of argument in a civil jury trial must be determined in light of the facts of the particular matter, the conduct and atmosphere of that particular trial, and the arguments of opposing counsel. Devlin v. Westinghouse Elec. Corp., 96-484 (La.App. 5th Cir.12/11/96), 686 So.2d 920, 927; writ denied 97-C-0098 (La.3/14/97), 689 So.2d. 1384. The parties are granted great latitude in argument *23 before a civil jury, but the trial judge has the duty to confine the arguments within proper bounds. Devlin, supra, citing Bourque v. Gulf Marine Transp., Inc., 480 So.2d 337, 342 (La. App. 3rd Cir.1985). The trial court's rulings regarding alleged improper argument are presumed to have been made within the trial court's discretion, unless the contrary is shown. The trial court is in a better position than an appellate court to determine possible prejudicial effects resulting from counsel's argument before a jury, and its rulings will not be reversed absent abuse of discretion. Caballero v. Catholic Mut. Ins. Co., 97-1458 (La.App. 1st Cir.6/29/98), 718 So.2d 511, 514; writ denied 98-C-2498, (La.11/25/98), 729 So.2d 567. Defendants have alleged but not shown that the jury was improperly influenced by the videotape excerpts. Considering all of the evidence before the jury, we find no abuse of discretion here.

TESTIMONY VALUING HEDONIC DAMAGES; EXCESSIVE AWARD
Defendants aver that it was error for the plaintiff's economist, Dr. Melville Wolfson, to quantify hedonic damages, or "loss of enjoyment of life". Initially we note that the jury awarded a lump sum of $2,641,330.00 for survival damages and did not itemize the damage award. Therefore it is difficult, if not impossible, to determine what portion of the award was given for loss of enjoyment of life.
Defendants objected to any testimony from Dr. Wolfson on this issue and a Daubert[4] hearing was held. Dr. Wolfson testified that the method he used to calculate loss of enjoyment of life assumes earning capacity as a unit of measurement and the value of leisure time as determined by that earning capacity. He agreed that the economic testimony had a very limited function, that the determination rests with the fact finder, and that this was but one component of the damages. Dr. Wolfson admitted that his methodology is unique and he has not published any material on the matter. The trial court first admitted the testimony, and Dr. Wolfson valued this portion of damages at $1,228,565.00. The court later determined it had committed error and instructed the jury to disregard this testimony. We agree with the statement in Foster v. Trafalgar House Oil & Gas, 603 So.2d 284, (La.App. 2nd Cir.1992), that economic theories which attempt to extrapolate the "value" of human life from various studies of wages, costs, etc., have no place in the calculation of general damages. See also Mistich v. Volkswagen of Germany, Inc. 94-0226 (La.App. 4th Cir.6/25/97), 698 So.2d 47, wherein the court determined to reject the testimony of Dr. Wolfson on this same issue: "[Hedonic damages] refers to damages for loss of enjoyment of life. They are included in the concept of general damages because, like pain and suffering, they cannot be quantified with any degree of `pecuniary exactitude' or measured definitely in terms of money." Id, at 51. We agree that it was error for the court to permit that testimony.
Nevertheless, the court instructed the jury to ignore that testimony, and there is nothing in the record to indicate that this instruction was lost on the jury. Defendants argue that the award was inflated as a result of the Wolfson calculations. We disagree. The losses associated with this claim are lost earnings to the date of Mr. Clark's death, his pain and suffering, and his medical expenses.
*24 A lump sum judgment is presumed to award all items of damages claimed, and appellant's burden of proving an abuse of discretion is more difficult because the intent to award a specific amount for a particular item is not readily ascertainable. Reichert v. Bertucci, 96-1213 (La.App. 4th Cir.12/4/96), 684 So.2d 1041, 1044; writ denied 97-C-0023 (La.2/7/97), 688 So.2d 511. In the present case, Mr. Clark's medical expenses were $126,609.30 and his lost earning capacity was $30,707.00. General damages therefore total $2,484,014.00. Defendants argue that an award of that magnitude for a 52 year old plaintiff who was diagnosed with cancer in April of 1994 and died in June of 1995 is excessive. They aver that an award of that amount can only be attributable to the testimony attempting to calculate hedonic damages.
The trial court has much discretion in assessing general damages, and an appellate court should not modify the award unless it is beyond that which a reasonable trier of fact could assess for a particular injury to the particular plaintiff under the particular circumstances. Youn v. Maritime Overseas Corp., 623 So.2d 1257, 1261 (La.1993), cert. den. 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Reichert v. Bertucci, supra. Only if the appellate court finds an abuse of discretion may it examine prior awards of general damages to determine the amount the trier of fact reasonably could award. Theriot v. Allstate Insurance Co., 625 So.2d 1337, 1340 (La.1993); Thom v. Benson Chevrolet Co., Inc., 99-1150 (La.App. 5th Cir.4/25/00), 759 So.2d 988, 1001-1002.
The cancer spread inside Mr. Clark's body rather vigorously and caused a very painful fourteen months. This cancer is untreatable and causes intractable pain because the tumor encases the lung and causes the person to die due to suffocation. Prior to his diagnosis he had a very active family life, and could not describe the pain of no longer being able to do so. He could no longer do any leisure activities such as fishing or camping. He could no longer attend church regularly because he was in too much pain. At the time of his deposition, he stated that being relegated to laying around made him feel as if he were dead. After being diagnosed, he was hospitalized every two weeks to have fluid removed from his chest. Sometimes a steel rod had to be inserted to put a chest tube inside. These were very painful procedures, requiring him to be hospitalized from 3 days to a week. Mrs. Clark recalled her husband's pain and screaming during the treatments, which he himself described as so bad that he thought he would die from it. He also underwent chemotherapy once a month for three days at a time, for a period of five months. He had two other opinions and underwent some serum treatments in Greece. There were several biopsies.
Mr. Clark had difficulty sleeping due to pain and discomfort and it would take 10 or 15 minutes to position him comfortably. He had some bedsores and could not dress himself. He was very depressed and humiliated about appearing to be weak. He had to be helped to get a glass of water, and couldn't use the remote control. Considering all of the circumstances of the particular illness on this particular plaintiff, we find the jury award, although high, is not so much so as to be excessive.[5]

EXECUTIVE OFFICER LIABILITY
For the reasons enunciated in the opinion on the Group I plaintiffs, the finding *25 of liability against Mr. Kelmell is reversed. Because Mr. Clark stopped work at Avondale in 1971-72, the finding of liability against Mr. Chantrey is also reversed. Mr. Clark was employed at Avondale for various periods between 1964-1972. Though at different times within this period, during these years both Territo and O'Donnell had, and breached, his duty to provide Mr. Martinez with a safe workplace, as this court noted in our previous opinion. During Mr. O'Donnell's tenure as safety department head (1948 December 13, 1971), Mr. Clark was employed for approximately seven years. During Mr. Territo's tenure in the safety department, which was from 1961 to post-1976, Mr. Clark was employed for approximately eight years.
O'Donnell acknowledges (in brief) that he was delegated the duty to comply with the government regulations regarding asbestos safety, but claims the jury committed manifest error in finding him liable. We disagree.
During the entire tenure of O'Donnell, the Walsh-Healey Act was in effect. While the Walsh-Healey Act did not require Avondale to measure asbestos dust levels on a periodic basis, the act did require levels be measured if there was any indication the established levels were being exceeded. Every plaintiff who testified described the dusty conditions at Avondale. Dr. Dement testified that the presence of visible dust indicated the levels exceeded those set by Walsh-Healey. Chantrey testified that if there was as much dust in the air as described by plaintiffs, then the levels should have been monitored. The evidence is clear that during O'Donnell's tenure the testing of asbestos dust levels was not performed, and it was reasonable for the jury to conclude that those levels could have exceeded Walsh-Healey's requirement at various times. Furthermore, the evidence also suggests that O'Donnell should have been aware that there was a potential for harm from the inhalation of asbestos dust, yet very few, if any, preventative measures were taken during his tenure. And while plaintiffs assert that the standard of care is more than simply complying with government regulations, we need not reach that conclusion because the jury could have reasonably found that the government standards of the time were not followed.
Considering this evidence, as well as the entirety of the record on the issue, we cannot say the jury was clearly wrong with respect to the liability of O'Donnell.
Mr. Territo testified that it was his duty to be sure there was compliance with the safety regulations. He stated that he went onboard the ships and in the engine rooms on a daily basis to be sure these regulations were followed. He testified that there was dust floating in the air in the engine rooms, and explained that although there was ventilation, there was no exhaust to remove the dust from the immediate work space. During Territo's testimony, a document was introduced that indicated that he expressed concern over the long range legal ramifications regarding Avondale's use of asbestos products. Additionally, Chantrey testified that he relied on Territo to be sure the OSHA regulations were carried out. Chantrey also testified that Territo was in charge of all of the safety professionals and their performance, and that it was Territo who directed the safety personnel and followed up with them. We find the evidence sufficient to support the jury's finding that Territo was delegated the specific duty to ensure that Avondale complied with OSHA regulations regarding asbestos use and that he breached that duty. His admitted knowledge of the dangers of asbestos dust, *26 his recognition that it was present, at least in the engine rooms, and the lack of any preventative measures, other than arguably inadequate ventilation, provides sufficient basis for us to say that there was no manifest error by the jury as to Territo's liability.

JNOV
In the main opinion, and for the reasons stated therein, we affirm the JNOVs in favor of Anchor Packing, Armstrong, Flexitallic, Garlock, and Uniroyal. However, with regard to the JNOVs in favor of Babcock & Wilcox, Combustion Engineering, Rapid American, and Rock Wool, we have examined the evidence as applicable to this plaintiff. The evidence regarding Mr. Clark shows that he worked in the engine rooms as a mechanic who prepared boilers, etc. He worked beside the insulators and pipe fitters, and mixed insulator cement. Thus it was proven that Mr. Clark worked in close proximity to the latter defendants excepting Combustion Engineering, which was not a named defendant. The JNOV in favor of Babcock & Wilcox, Rapid American, and Rock Wool is reversed as to Mr. Clark, and the virile shares of those defendants are returned for calculation.

VIRILE SHARE CALCULATION
The judgment on appeal is determined as follows. The jury found seven defendants liable: Westinghouse, Pittsburgh-Corning, Owens-Corning, Chantrey, Kelmell, Territo, and O'Donnell. Thirteen settled manufacturers were found liable: A.P. Green, Anchor Packing, Armstrong, Babcock & Wilcox, Fibreboard, GAF/Ruberoid, Garlock, Johns-Manville, National Gypsum, Rapid American, Rock Wool, Uniroyal, and UNARCO, for a total of 20 virile shares. We subtract two shares for Kelmell and Chantrey whose liability has been reversed on this appeal, and four shares for the JNOVs which we have affirmed in favor of Anchor Packing, Armstrong, Garlock, and Uniroyal, leaving a total of 14 virile shares. The jury's damage award of $2,641,330.00 on the survival action divided by 14 equals $188,666.43 per virile share. Judgment is entered against the two remaining non-settling defendants.

DECREE
The trial court's judgment of December 9, 1996 is SET ASIDE IN PART, REVERSED IN PART, AND AFFIRMED IN PART. We SET ASIDE the jury awards for wrongful death. We REVERSE the finding of liability as to John Chantrey and George Kelmell. We REVERSE the JNOV removing Rapid American, Rock Wool, and Babcock & Wilcox from the virile share calculation, and find that each contributed to Mr. Clark's injuries. In all other respects the judgment is affirmed.
Pursuant to the above findings, IT IS ORDERED, ADJUDGED, AND DECREED that there be judgment in favor of Patrick Clark and against Peter Territo and James O'Donnell in the amount of $377, 332.86, plus legal interest from date of judicial demand. Costs of this appeal are taxed to appellants Peter Territo and James O'Donnell.
SET ASIDE IN PART, REVERSED IN PART, AFFIRMED IN PART AND RENDERED.
NOTES
[1] Anchor Packing, Babcock & Wilcox, Fibreboard, Garlock, Johns-Manville, Rapid American, Rock Wool, Uniroyal, and UNARCO.
[2] 283 So.2d 716 (La.1973).
[3] Prior to October 1, 1976, the immunity from suit in tort provided by R.S. 23:1032 did not extend to executive officers of an employer.
[4] Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) was held.
[5] Our finding is bolstered by several recent cases outside of Louisiana. See e.g. In re ASBESTOS LITIGATION, 986 F.Supp. 761, (S.D.N.Y.1997), and cases cited therein.